The HUNTINGTON NATIONAL BANK, Plaintiff–Appellee,

v.

John Jay HOOKER, Defendant–Third-Party Plaintiff–Appellant,

v.

Bernard C. JOHNSON, Third–Party Defendant.

Court of Appeals of Tennessee, Middle Section, at Nashville.

March 13, 1991.

Application for Permission to Appeal Denied by Supreme Court Nov. 4, 1991.

Steven A. Riley, Jeannette C. James, Bass, Berry & Sims, Nashville, for plaintiff-appellee.

Robert S. Patterson, Scott K. Haynes, Boult, Cummings, Conners & Berry, James F. Sanders, Edmund L. Carey, Jr., Neal & Harwell, Nashville, for defendant-appellant.

## OPINION

LEWIS, Judge.

This is an appeal by defendant John J. Hooker (Hooker) from the trial court's

granting of plaintiff's, The Huntington National Bank's (Bank), motion for summary judgment and entry of judgment on a note executed by Hooker to the Bank. The judgment of $351,512.48 included the principal sum of the note of $245,000.00 plus accrued interest of $56,512.48 and attorney's fees of $50,000.00.

## PROCEEDINGS BELOW

The Bank filed its complaint in the Chancery Court for Davidson County against Hooker seeking to recover on a due but unpaid note. In his answer, Hooker admitted executing the note but alleged that he was not liable because of a "lack of consideration." Hooker counterclaimed for damages for the Bank's alleged breach "of its obligation of its act of good faith in its dealing with John Jay Hooker, and its failure to honor its oral contract to allow payment of the Note through renewal." Hooker also filed a third-party complaint against Bernard C. Johnson (Johnson).[1]

On 14 July 1989, Hooker was allowed to file an amended answer which deleted paragraph 6 of the original answer. Paragraph 6 of the original answer provided as follows:

The plaintiff agreed to accept payment of its Note through renewal until such time as the note of Bernard Johnson which secured Plaintiff's Note matured. Accordingly, the Plaintif [sic] waived its right to demand cash payment, and is estopped to deny its agreement to accept satisfaction of the Note through renewal.

In his motion to amend answer and counter-complaint, Hooker admitted that the

Johnson note had matured and Hooker also deleted from his answer the defense that the Bank had waived its right to demand a cash payment.

An agreed order was entered by the trial court on 4 October 1989 setting a pre-trial conference for 15 December 1989 and re-setting the case for trial from 28 September 1989 to 23 January 1990.

On 13 November 1989, the Bank moved for summary judgment. Hooker filed his response to the motion for summary judgment on 13 December 1989 and raised as an issue, for the first time, that the Bank's loan to him "was in violation of federal criminal law and therefore illegal and void."

Following a pre-trial conference on 15 December 1989, the trial court entered a pre-trial order stating that the only two issues that would be submitted to the jury were the defenses of (1) failure of consideration and (2) breach of implied warranty and duty of good faith.[2]

On 29 December 1989, the Bank filed its reply to Hooker's response to the Bank's motion for summary judgment. In its reply, the Bank contended that Hooker waived the affirmative defense of "illegality" by not raising it in his answer or amended answer pursuant to Tennessee Rule of Civil Procedure 12.08.

Simultaneously, on 29 December 1989, Hooker filed a motion to amend his answer to assert the defense of "illegality." Although he admits that he knew of the facts which he claims form the basis of the "illegality" defense or learned them early in

---

**1.** Hooker's third-party claim against Johnson alleged that Johnson by express oral agreement had agreed to satisfy the loan to Hooker from the Bank and that he had expressly contracted on 5 June 1987 to have Hooker released from his obligations to the Bank. Hooker sought specific performance and compensatory damages against Johnson. Johnson answered and counterclaimed against Hooker, alleging Hooker's breach of the June 1987 contract and further alleging that Hooker had slandered and libeled Johnson. Johnson sought compensatory and punitive damages against Hooker.

On 5 July 1989, an order compelling arbitration of Hooker's and Johnson's claims against each other as per the express provisions of the June 1987 contract was entered along with a stay of further court proceedings regarding those claims until the general arbitration was complete.

**2.** Hooker in his brief states: "Although Hooker argued below that the 1986 notes failed for lack of consideration, he does not urge that argument on this appeal."

the discovery process, Hooker did not initially plead "illegality" as a defense. Hooker also did not plead "illegality" when he filed his amended answer and counterclaim on 14 July 1989.

On 24 January 1990, the trial court denied Hooker's motion to amend, granted the Bank's motion for summary judgment, dismissed Hooker's counterclaim, and entered judgment in the sum of $351,512.48.

Hooker then sought to appeal the case but this Court dismissed the appeal because the judgment was not a final judgment appealable as of right. Tenn. R.App.P. 3(a).[3]

On remand, the Bank moved for entry of final judgment pursuant to Tenn.R.Civ.P. 54.02. Hooker opposed this motion. On 14 August 1990, the trial court, after finding there was "no just reason for delay," entered final judgment pursuant to Rule 54.02.

### THE FACTS

In October 1985, Hooker met Johnson and discussed Johnson's becoming involved in Hooker Enterprises, Inc. Shortly after this meeting Hooker conducted a three-month, "first-class due diligence"[4] of Johnson and concluded that he would like to have Johnson as a major shareholder in Hooker Enterprises, Inc. As part of the plan to sell all of his stock in Hooker Enterprises to Johnson and Johnson's brother-in-law, Nick Kapioltas, Hooker arranged for Johnson to purchase the stock and options in Hooker Enterprises held by RAZ Investments Company and Zimmerman Investments, Inc. (referred to collectively as the Zimmerman interest). The total purchase price of $415,000.00 for the Zimmerman interest was to be paid in cash. Payment

to Hooker for his stock was to be by note from Johnson and Johnson's brother-in-law.

On 21 January 1986, Hooker entered into an agreement with Johnson in which Hooker agreed to loan Johnson $245,000.00 in order to provide partial financing for Johnson's purchase of the Zimmerman interest. Hooker testified that prior to 21 January, he had advised Johnson that he did not have the $245,000.00 to loan Johnson.

Johnson was an advisory director of the Bank's Akron, Ohio office. Thomas Williams was a senior vice president of the Bank and City Executive Officer for the Akron branch. At some point Hooker sent a copy of his personal financial statement to Thomas Williams at Williams' request. Hooker's financial statement showed his net worth to be approximately four million dollars with annual income from salary and a consulting fee of approximately $300,-000.00.

On or about 23 January 1986, Williams flew to Nashville to meet Hooker and arrange for the $245,000.00 loan. There is conflicting testimony as to whether Johnson attended this meeting. Hooker testified that Johnson and Williams understood that the purpose of the loan to Hooker was so that Hooker could loan the money to Johnson to use in purchasing Hooker Enterprises.

Hooker testified that before he signed the note to the Bank, he went to dinner with Williams and asked him: "Do you know of any reason that Mr. Johnson's indebtedness to the bank or Mr. Johnson's character or Mr. Johnson's relationship to the bank or your relationship to the bank, or do you know of anything that if I knew I wouldn't sign this note?" According to Hooker, Williams replied: "No." Hooker stated: "I thought that Tom Williams was

---

3. This Court noted, in dismissing the appeal, that there was a third-party claim pending which had not been adjudicated, severed or dismissed.

4. Due diligence is defined as "such a measure of prudence, activity, or assiduity, as is properly to

be expected from, and ordinarily exercised by, a reasonable and prudent man under the particular circumstances; not measured by any absolute standard, but depending on the relative facts of the special case." Black's Law Dictionary (4th ed. 1951) (citing *Perry v. Cedar Falls*, 87 Iowa 315, 54 N.W. 225 (1893)).

vouching for Bernard [Johnson]. Gave me a lot of comfort."

Hooker executed the note on 23 January 1986 for $245,000.00 due in ninety days. Johnson executed a promissory note to Hooker for $250,000.00 with principal and interest due in three years.

Hooker testified in his deposition that Williams assured him that the ninety day note would not be called but would be renewed unless there was a material adverse change in the circumstances of Hooker Enterprises. Hooker further testified that Williams stated that the note was a "sunshine note" which would be renewed "as long as everything is going good."

On 23 January 1986, after Hooker had signed the promissory note to the Bank, Johnson drew $170,000.00 from an existing line of credit of his own at the Bank and, upon instructions from his attorney, wired a total of $415,000.00 ($245,000.00 from the Hooker loan and $170,000.00 from Johnson's separate line) to the Zimmerman accounts at Third National Bank in Nashville.

The original note was renewed at the end of the first ninety day period in April 1986. In May 1986, officials at the Bank became aware of irregularities in the number of loans made under Williams' authority through the Akron office which involved Johnson or Johnson's associates. In early June, 1986, Williams confessed to Mr. Richard Lehman, an investigating officer of the Bank, that "he (Williams) was in serious trouble." Lehman concluded that the majority of some 32 to 36 million dollars worth of Johnson's related loans were in violation of the Bank's aggregation policy. Williams resigned from the Bank in June.

On 10 July 1986, Lehman wrote to Hooker that the Bank did not intend to renew the note on July 23 when it was due and demanded payment of all principal and interest by 15 August 1986.

Hooker protested, and Lehman replied on 1 August 1986 that the reason the note was being called was "among other considerations, that your loan is not in our current market area. Additionally, this loan is the sole extent of our banking relationship with you." There was no indication at that time of dissatisfaction with the creditworthiness of either Hooker or Hooker Enterprises.

Hooker entered into negotiations with the Bank and, on 27 December 1986, the Bank accepted a renewal note executed by Hooker in return for cancellation of the original note. As additional security, Hooker also pledged the $250,000.00 Johnson note.

Ninety days thereafter, when the renewal note matured, the Bank demanded payment. Hooker failed to pay, and this suit resulted.

In June 1987, the Bank submitted a Criminal Referral Form to the Comptroller of the Currency because the Bank had considered the possibility that the Williams–Johnson loan pattern constituted criminal activity.

## THE ISSUES

Hooker's first issue is: "The Trial Court's Conclusory Failure to Express Any Rationale for Its Certification of the Summary Judgment as a Final Judgment Under Rule 54.02 Fails to Satisfy the Requirements of the Rule and Divests This Court of Appellate Jurisdiction."

Tennessee Rule of Civil Procedure 54.02 provides:

When more than one claim for relief is present in an action, whether as a claim, counterclaim, cross-claim, or third party claim, or when multiple parties are involved, the court, whether at law or in equity, may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated,

that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of the judgment adjudicating all the claims and the rights and liabilities of all the parties.

Hooker contends that the trial court must articulate the basis for its "express determination that there is no just reason for delay" under Rule 54.02 and that a failure by the trial court to do so deprives this Court of jurisdiction. So far as we are able to determine, there has been no Tennessee case which has squarely addressed this issue.

■ Hooker contends that Tennessee appellate decisions have not addressed this issue and that since Tenn.R.Civ.P. 54.02 and Federal R.Civ.P. 54(b) are almost identical, we should rely on federal decisions. It is proper that Tennessee courts look to the interpretation given comparable federal rules by the federal courts. *Williamson County v. Twin Lawn Dev. Co.*, 498 S.W.2d 317, 320 (Tenn.1973). The appellate courts of Tennessee do look to the federal courts for guidance when the federal courts have interpreted a rule that has not been interpreted by the Tennessee courts. However, we are not compelled to follow decisions of federal courts. Those decisions are for guidance only.

Hooker cites *Knafel v. Pepsi Cola Bottlers of Akron, Inc.*, 850 F.2d 1155 (6th Cir.1988), which held that under Federal Rule of Civil Procedure 54(b), the district court had a duty to explain the factors warranting certification. Absent such an explanation, no deference was due the lower court's order, and the appellate court was "without jurisdiction" to consider the appeal due to a lack of finality. *Id.* at 1159. *See* also *Consolidated Rail Corp. v. Fore River Railway Co.*, 861 F.2d 322, 325–26 (1st Cir.1988); *Ansam Assoc., Inc. v. Cola Petroleum Ltd.*, 760 F.2d 442, 445 (2nd Cir.1985). The Sixth Circuit also held in *Solomon v. Aetna Life Ins. Co.*, 782 F.2d 58, 61 (6th Cir.1986), that "a proper exercise of discretion under Rule 54(b) requires the district court to do more than just recite the 54(b) formula of 'no just reason for delay.'"

■ However, the federal circuits are not unanimous. In *Schwartz v. Compagnie General Transatlantique*, 405 F.2d 270 (2nd Cir.1968), the court held that there was no abuse of discretion in certifying final judgment by simply stating that there was "no just reason for delay." The court went on to state that "Rule 54(b) orders should not be entered routinely or as a courtesy to counsel and suggest that when such orders are granted, the trial court marshal the competing considerations and state the ones considered to be most important." *Schwartz*, 405 F.2d at 275. We fully agree that a Tennessee Rule of Civil Procedure 54.02 order should not be entered routinely or as a courtesy to counsel. We would go further and state that it cannot be routinely entered as a courtesy to counsel.

In *Rothenberg v. Security Management Co., Inc.*, 617 F.2d 1149 (5th Cir.), *cert. denied*, 449 U.S. 954, 101 S.Ct. 359, 66 L.Ed.2d 218 (1980), the court held that to articulate the reasons for allowing a Rule 54(b) appeal was left to the discretion of the trial court and was not imposed as a requirement in all cases. *Id.* at 1150. The *Rothenberg* court went on to state:

However, when the case is of such a nature that the reasons for the 54(b) certification are unclear, it may be necessary for adequate appellate review to require that the district court's reasons be stated. What is said here is intended to encourage, not inhibit, such helpful explanations in any future cases, although we hold only that it is not a required procedure in this circuit at this time.

*Id.*

As can be seen, the federal circuits are not unanimous in their holdings that articu-

lated reasons for determining that there is no just reason for delay in directing entry of final judgment is jurisdictional.

At least three state courts have spoken to this issue.

In *McKown v. Criser's Sales and Ser.*, 48 Md.App. 739, 430 A.2d 91 (1981), the court held that nothing in Maryland's Rule 605(a) (Maryland's version of Fed.R.Civ.P. 54(b)) required the trial court to articulate its reasons for holding that no just reason for delay existed and that final judgment should be entered.

In *Dattoli v. Hale Hosp.*, 400 Mass. 175, 508 N.E.2d 100 (1987), the court held that the trial court had not abused its discretion in ordering the entry of final judgment without articulating reasons to support the determination that there was no just reason for delay.

In *Union State Bank v. Woell*, 357 N.W.2d 234 (N.D.1984), the court stated:

> . Although we agree that it is the better practice for the trial court to provide a written statement showing the basis of its decision, we will not remand to the trial court for a statement of reasons if we can determine the basis of the court's decision to certify under Rule 54(b) from the record.

*Id.* at 238. The court went on to state that the basis of the trial court's ruling was apparent from the record but that the certification was defective because the record failed to show there was no just reason for delay.

The question of whether the trial court must articulate its reasons for determining that no just reason exists for delay in entry of final judgment was not addressed by the court in *Fox v. Fox*, 657 S.W.2d 747 (Tenn. 1983). However, Justice Drowota, writing for the Court, stated in part as follows:

> Rule 54.02 requires as an absolute prerequisite to an appeal the certification by the trial judge, first, that the court has directed the entry of a final judgment as to one or more but fewer than all of the

claims, and, second, make an express determination that there is no just reason for delay. Such certification by the trial judge creates a final judgment appealable as of right under Rule 3 T.R.A.P.

*Id.* at 749.

It is readily apparent that the court in *Fox* simply stated that to comply with Rule 54.02, the trial court must make only "an express determination that there is no genuine reason for delay" and direct "the entry of final judgment."

When the trial court determines that no just reason for delay exists and directs "the entry of final judgment," it is implicit that there has been a finding by the trial court which supports that conclusion.

This Court reviews findings of fact of the trial court, whether they be express or implied, de novo upon the record. Tenn. R.App.P. 13(d). This Court may *sua sponte* review the record on appeal to determine if we properly have jurisdiction. Tenn.R.App.P. 3(a). If after our review we determine that the trial court has, pursuant to Rule 54.02, improperly determined that "no just reason for delay" exists, then the appeal must be dismissed. Tenn.R.App.P. 3(a).

■ There is no requirement in Tennessee that the trial court state the underlying reasons for certification pursuant to Rule 54.02. We can think of no compelling reason to adopt such a rule. We do state that it is the better practice for the trial court to provide a finding of fact showing the basis of its decision to grant the Rule 54.02 certification.

We have reviewed the trial court's determination that there is "no just reason for delay" and find that the basis of its decision is apparent from the record. The trial court's grant of summary judgment disposed of all claims between the Bank and Hooker. The only claims left unadjudicated were the third-party claim between Hooker and Johnson and Johnson's counterclaim. The dispute between Hooker and

Johnson is a separate and distinct dispute. The outcome of the dispute between Hooker and Johnson will have no effect on the validity of the note executed by Hooker or the Bank's right to enforce it.

The claims which have been adjudicated between Hooker and the Bank and the unadjudicated claims between Hooker and Johnson are not "tightly interwoven."

There is no merit to Hooker's contention that the Rule 54.02 certification was error because he is prejudiced in that he has a judgment in excess of $300,000.00 against him while his claim against Johnson is outstanding.

We find no error in the trial court's granting of the Rule 54.02 certification. This issue is without merit.

■ Hooker's second issue is as follows: "The Trial Court Clearly Abused Its Limited Discretion Under Rule 15 By Denying Hooker's Motion to Amend His Answer to Plead a Defense of Illegality, When No Prejudice was Shown by the Bank and the Amendment Merely Sought to Conform the Pleadings to Matters Already Being Litigated."

Tennessee Rule of Civil Procedure 15.01 provides in pertinent part: "[A] party may amend his pleadings only by written consent of the adverse party or by leave of court; and leave shall be freely given when justice so requires."

Justice Henry in *Branch v. Warren*, 527 S.W.2d 89 (Tenn.1975), a case in which the trial court had denied a pre-trial amendment, stated in part as follows:

Plaintiffs, as Appellants in this Court, assign as error the action of the trial judge in overruling their motions to amend. We regard this as error. The policy of our law has long favored amendments. Section 198, *Caruthers' History of a Lawsuit*, Eighth Edition (1963) reads, in pertinent part as follows:

Under the very liberal rules allowing amendments, the court may admit material amendments at any stage of the

proceedings. The Supreme Court of Tennessee has said: "It is a downright violation of principles, and of good sense, to determine any case otherwise than on its merits, and it is a great imputation upon judges that so many statutes of jeofails have been needful to place common sense upon her native seat, from which she has been driven by technicalities."

The new Rules of Civil Procedure, in this regard "come not to destroy the old law, but to fulfill." They were designed to simplify and ease the burden of procedure under the sometimes harsh and technical rules of common law pleading. Accordingly, Rule 15.01 provides that leave (to amend) shall be freely given when justice so requires. This proviso in the rules substantially lessens the exercise of pre-trial discretion on the part of a trial judge. Indeed, the statute (§ 20–1505, T.C.A.) which conferred a measure of discretion on trial judges was repealed and Rule 15 stands in its place and stead. That rule needs no construction; it means precisely what it says, that "leave shall be freely given."

*Id.* at 91–92.

In *Merriman v. Smith*, 599 S.W.2d 548 (Tenn.App.1979), this Court had before it the issue of whether the trial court erred in failing to grant a motion to amend. We stated in part as follows:

[S]ome of the broad and legitimate factors a trial judge should weigh in considering a Motion to Amend [are] [u]ndue delay in filing; lack of notice to the opposing party; bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment.

*Id.* at 559.

While the trial court stated no reason for denying the motion to amend, we are of the opinion that it correctly denied the amendment for the reason that, even if allowed, the amendment would have been futile.

Hooker argues that by filing the Criminal Referral Form, the Bank admitted that Williams and Johnson exposed the Bank to a risk of loss and "thus misapplied bank funds in violation of 18 U.S.C. § 656." Section 656 provides in part as follows: "Whoever, being an officer, director, agent or employee of, or connected in any capacity with any ... national bank ... embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank ... [commits a felony]."

Hooker contends that

[t]he evidence of Williams' and Johnson's roles at the Bank, of their concealment on bank documents of the true nature of the Hooker–Johnson and similar loans, as acknowledged by the Bank's report to the Comptroller of the Currency, suffices to bring these facts within the ambit of "nominee" loan cases under § 656.

Hooker in essence argues that there was a willful misapplication of Bank funds by Williams and Johnson and therefore a violation of Section 656. Thus, he should be relieved of the $245,000.00 loan because the Bank knew it was a "nominee" loan, *i.e.*, that the proceeds of the loan were going to Johnson and not to him.

A similar argument was rejected by the court in *United States v. Gens*, 493 F.2d 216 (1st Cir.1974). In *Gens*, certain officers and directors of the bank were convicted of violations of Section 656 in that they willfully misapplied funds of a federally insured bank. On appeal, the court reversed the conviction stating that even though the bank officers knew that the borrower would turn over the proceeds of the loan to Gens and that Gens had borrowed to the limit of the Bank's self imposed loan limit, there was not a violation of Section 656. "[W]here the named debtor is both financially capable and fully understands that it is his responsibility to repay, a loan to him cannot—absent other circumstances—properly be characterized as sham or dummy, even if bank officials know he will turn over the proceeds to a third party." *Id.* at 222.

Hooker furnished the Bank a financial statement showing that his net worth was in excess of four million dollars and that he had an annual salary of $150,000.00 and an annual consulting income of $185,000.00. Hooker furnished the Bank with evidence that he had the ability to repay the note.

While Williams knew that Hooker was relying upon Johnson to pay Johnson's note to Hooker before Hooker would pay the note to the Bank, Hooker testified that he knew if he signed "a note that you have to expect to repay it" and further: "I (Hooker) saw *no difference signing a note with the Huntington Bank than I would have seen in signing the note at American.* I knew I put my name on that note. And so implicit in our conversation was the fact that I took the matter serious."

While Johnson and Williams may have been guilty of a violation of 18 U.S.C. Section 656 in some other particulars, there is no evidence in this record that they violated Section 656 regarding the Hooker loan.

If the amendment to the pleadings had been allowed it would have gained nothing for Hooker. The granting of the motion to amend would have been an exercise in futility. *Merriman v. Smith*, 599 S.W.2d at 559. We find nothing in the record to show that either the original or renewal note were illegal or violated any statute.

Hooker borrowed the $245,000.00 from the Bank so he could lend it to Johnson. In turn, Johnson, a man whom, after a three-month, "first class due diligence," Hooker concluded he wanted as a partner, would purchase a controlling interest in Hooker Enterprises, Inc. This issue is without merit.

Hooker's third, and final, issue is: "The Trial Court Erred in Granting Summary Judgment to Dismiss Hooker's Defense and Counterclaim for the Bank's Breach of the Duty of Good Faith."

Hooker admits that he executed the original note and that on 27 December 1986 he executed the renewal note. He contends, however, that he should not be liable on the

note because he had an understanding with the Bank that Johnson was the actual borrower and that the loan would not be called. In other words, Hooker understood that he would never have to pay the note.

This Court, in *Farmers and Merchants Bank v. Petty*, 664 S.W.2d 77 (Tenn.App. 1983), was faced with a similar situation. Clyde Petty co-signed a $2,000.00 promissory note with his son, Andrew. Over time the indebtedness of Andrew and Clyde Petty to Farmers and Merchants Bank "increased to $35,267.00 for which Andrew and Clyde signed a note on March 17, 1979." *Id.* at 78.

The note was not paid when due, and suit was brought by Farmers and Merchants Bank against the Pettys. Clyde Petty "plead fraud and counterclaimed for damages." *Id.* "The fraud claimed by [Clyde Petty] was that he was induced to sign the note by the statement of the president of [Farmers and Merchants Bank], that [Clyde Petty] would never have to pay the note." *Id.*

Clyde Petty testified in part as follows:

> Well, he and I [the President of Farmers and Merchants Bank] had about two hours or much better conversation.—I told him first that he could have a second mortgage and I was coming off of it. He said "no, I want you on it, and we'll leave the second mortgage on it."
>
> Then he promised me faithfully that if I would sign it—again, that the bank examiners were coming, and to get him off of the hook. And he guaranteed that I would never have it to pay.

*Id.* at 79.

This Court reversed the judgment entered on the jury's verdict for Clyde Petty, dismissed Petty's counter-suit, and remanded for a trial on the note. *Id.* at 82.

In doing so, this Court stated in part as follows:

> Another reason why the doctrine of promissory fraud should not be applied to the present facts is that the alleged fraudulent statement expressly negated the obligation of a written instrument. In *Fowler v. Happy Goodman Family* [575 S.W.2d 496 (Tenn.1978) ], the alleged fraudulent statement did not contradict a written contract but related to other collateral matters between the parties. In the present case, the theory of defendant-appellee is, "I signed a written obligation to pay $35,000.00, but he told me I was not to be obligated." This would be a clear instance of parol evidence offered to contradict the sole obligation of a written contract.
>
> Granting the necessity and justice of allowing defenses based upon misrepresentations which do not contradict or change the plain terms of a written instrument, the allowance of defenses based on oral statements clearly inconsistent with the written instrument sued upon would appear to be a radical departure from long established and accepted rules of law and would defeat the very purpose of committing agreements to writing.
>
> Without doubting the veracity of the testimony of defendant-appellee, it must be recognized that one of the reasons for the parol evidence rule is to prevent fraud in presenting oral defenses to written instruments. That is, the parol evidence rule assumes that the parties deliberately chose to put their agreement in writing to avoid the uncertainties of oral evidence, including the possibility of false testimony as to oral conversations. Thus, the parol evidence rule is a "quasi-statute of frauds" which rejects evidence of any oral statement in contradiction of the terms of a written agreement.
>
> Without questioning the good faith of the participants in the present transaction, the adoption of the rule urged by appellee would permit any maker or endorser of a bank note to conspire with an officer of the bank to falsify the records of the bank for the purpose of deceiving the bank examiner and any others who might be affected thereby.

*Farmers & Merchants Bank,* 664 S.W.2d at 81–82. *See* also *First Tennessee Bank Nat'l Assn. v. Wilson,* 713 S.W.2d 907 (Tenn.App.1985).

■■■ Hooker insists that parol evidence is admissible and, in support of his insistence, cites *Brungard v. Caprice Records, Inc.* 608 S.W.2d 585, 588 (Tenn.App.1980), and *Haynes v. Cumberland Builders, Inc.,* 546 S.W.2d 228, 231 (Tenn.App.1976). Neither *Brungard* nor *Haynes* is applicable to the present case. Both *Brungard* and *Haynes* were suits sounding in tort. The instant suit is a suit upon a note, a contract. Parol evidence is not admissible to vary, qualify, contradict, or add to or subtract from the absolute terms of a written contract. *Specht v. Howard,* 83 (16 Wall.) U.S. 564, 21 L.Ed. 348 (1872). Hooker's testimony that it was understood that he would not have to pay the note is inadmissible and cannot be considered.

■■■ Hooker next argues that the trial court erred by dismissing his counterclaim against the Bank for the Bank's "unreasonable and bad-faith conduct" in "calling" both the January 1986 (original) note and the December 1986 renewal note.

Tennessee Code Annotated Section 47–1–203 provides: "Every contract or duty within chapters 1 through 9 of this title imposes an obligation of good faith in its performance or enforcement." "Good faith" means "honesty in fact in the conduct or transaction concerned." Tenn.Code Ann. § 47–1–201(19).

Good faith imposes "an honest intention to abstain from taking any unconscientious advantage of another, even through the forms and technicalities of the law." *Lane v. John Deere Co.,* 767 S.W.2d 138, 140 (Tenn.1989) (citations omitted).

In *Macon County Livestock Market, Inc. v. Kentucky State Bank, Inc.,* 724 S.W.2d 343 (Tenn.App.1986), this Court, speaking in regard to a bank's duty of disclosure, stated in pertinent part as follows:

[I]t has no special duty to counsel the customer and inform him of every material fact relating to the transaction—including the bank's motive, if material, for participating in the transaction—unless special circumstances exist, such as where the bank knows or has reason to know that the customer is placing his trust and confidence in the bank and is relying upon the bank so to counsel and inform him.

*Id.* at 350 (*quoting Klein v. First Edina Nat'l Bank,* 293 Minn. 418, 196 N.W.2d 619, 623 (1972).

Hooker argues:

The Bank cannot be allowed to collect a loan originated by its loan officer who knew that the anticipated source of repayment would not be available to Hooker, and that the loan was being made from the outset in violation of the Bank's aggregation and geographic policies. Williams knew far more than Hooker about Johnson's situation, and he knew that Hooker was looking to him for an honest response to the inquiry regarding Johnson's ability to repay Hooker. Yet, he (and therefore the Bank) failed to respond honestly to that inquiry.

Hooker cites no part of the record to support his assertion, and in our review we failed to find anything to support the assertion. There is nothing to show that Williams knew that Johnson would not be able to pay Hooker at the end of the three year term of Johnson's note to Hooker. There is nothing in the record to show that Williams knew far more than Hooker about Johnson's situation. Hooker had, by his own admission, done a three month, "first class due diligence" of Johnson.

Hooker's statement in his brief is nothing more than assertion unsupported by facts. Assuming that the conversation on 23 January 1986 between Hooker and Williams occurred exactly as Hooker described it, we find nothing in that conversation that shows a breach of duty of good faith. There is no evidence of any fact that should have been disclosed by the Bank. There is no evidence of dishonesty. There

is no evidence that Hooker relied on anything more than his own judgment of Johnson after making his three month "first-class, due diligence."

In all cases, concealment or failure to disclose, becomes fraudulent only when it is the duty of a party having knowledge of the facts to disclose them to the other party (citation omitted). And this author, in the same section says: "All the instances in which the duty to disclose exists and in which a concealment is therefore fraudulent, may be reduced to three distinct classes:

1) Where there is a previous definite fiduciary relation between the parties.

2) Where it appears one or each of the parties to the contract expressly reposes a trust and confidence in the other.

3) Where the contract or transaction is intrinsically fiduciary and calls for perfect good faith. The contract of insurance is an example of this last class."

*Macon County Livestock Market, Inc. v. Kentucky State Bank*, 724 S.W.2d at 349 (*quoting Domestic Sewing Machine Co. v. Jackson*, 83 Tenn. 418, 424–25 (1885).

Hooker admits that he did not have a fiduciary relationship with the Bank.

Hooker was not expressly relying on the Bank. He was not placing his "trust and confidence" in the Bank. Hooker, in several pages of his deposition, elaborates on the care with which he made his investigation of Johnson before deciding to enter into the agreement to loan Johnson $245,000.00 and to sell him controlling interest in Hooker Enterprises, Inc. Hooker had already made the decision to enter into the agreement and had, in fact, signed the agreement, agreeing to loan Johnson $245,000.00 two days before he talked with Williams and signed the original note.

There is no evidence in this record 1) showing a duty on the part of the Bank to disclose information about Johnson to Hooker or 2) showing that any information the Bank might have voluntarily disclosed would have affected Hooker's decision.

We agree with the Bank's argument: "Hooker may have made a bad business deal, but it was not caused by any failure of the Bank to exercise good faith in entering into the loan transaction with him." The third issue is without merit.

The judgment of the trial court is affirmed with the cause remanded to the trial court for the enforcement of its judgment, the collection of costs which are assessed to Hooker, and for any further necessary proceedings.

CANTRELL and KOCH, JJ., concur.