# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### November 1999 Session

## TIMOTHY E. ISBELL v. TRAVIS ELECTRIC COMPANY AND MILTON TRAVIS

**Appeal from the Circuit Court for Davidson County**
**No. 97C-475     Hamilton V. Gayden, Jr., Judge**

---

**No. M1999-00052-COA-R3-CV - Filed December 13, 2000**

---

After Plaintiff resigned from his job and attempted to start his own competing business, his former manager informed a mutual client of the circumstances surrounding his resignation. Plaintiff sued his former employer and its service manager, alleging slander, libel, defamation, and tortious interference with contract. The trial court directed a verdict for Defendants, and Plaintiff appeals, arguing that the trial court misapplied the substantial truth doctrine, failed to apply the doctrine of implication, and was incorrect in its finding that no contract existed between Plaintiff and his new company's main client. Plaintiff also insists that, by failing to grant a new trial so that he could add an allegation of invasion of privacy, the court ignored the proper legal consequences arising from the disclosure of a confidential drug test. For the following reasons, we affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., and WILLIAM B. CAIN, JJ., joined.

Christopher K. Thompson, Murfreesboro, Tennessee, Shelley I. Stiles, Brentwood, Tennessee, for the appellant, Timothy E. Isbell.

Thomas C. Corts, Nashville, Tennessee, for the appellees, Travis Electric Company and Milton Travis.

**OPINION**

Timothy E. Isbell sued his former employer, Travis Electric Company, and its service manager, Milton Travis, alleging slander, libel, defamation, and tortious interference with contract.[1] A jury was empaneled to hear the case. At the close of Plaintiff's proof, the trial court directed a verdict for TEC and Mr. Travis. We first review the facts as established by Plaintiff's proof.

I. Background

Mr. Isbell worked as an electrician at TEC for approximately three years. Over the course of his employment, much of Mr. Isbell's work involved installing electrical cable at various First American Bank branches. During Mr. Isbell's third year of employment, TEC initiated drug testing at the request of its workers' compensation carrier. Mr. Isbell underwent his first test on February 6, 1996, and tested positive for marijuana. Mr. Isbell testified that when he came in to take the test, "it was kind of a common known element, a joke, because everybody was laughing. Everybody was aware that I was not going to pass the test." He admitted that he told a supervisor, in front of a secretary, that he would not pass the test that day. Mr. Isbell did fail that test. He was not disciplined for failing the test, but was told he could take a second test thirty days later, which he took and passed.

Mr. Isbell's marijuana use was known by his coworkers. He admitted that, prior to the first drug test, he had often used marijuana, that he had smoked marijuana in the presence of coworkers, and that he regularly smoked just prior to having an apprentice drive him to out-of-town jobs in company trucks. He also admitted to smoking marijuana in hotel rooms paid for by his employer while on out-of-town jobs. Further, on one occasion he helped a coworker purchase a sufficient amount of marijuana to resell. In addition, he assisted an employee of First American Bank in a purchase of marijuana.

In November 1996, two TEC employees purportedly told Mr. Travis that Mr. Isbell was using marijuana again. One employee had asked not to be assigned to go on an out-of-town job with Mr. Isbell because Mr. Isbell was using marijuana again and the employee didn't want to be around it. Another employee was assigned to go on that out-of-town job with Mr. Isbell. Upon his return, that employee told Mr. Travis that Mr. Isbell had smoked marijuana in the truck on the way to the job and in the motel while on the out-of-town assignment. Shortly thereafter, Mr. Travis told Mr. Isbell that he would no longer have access to his company truck, telephone, and pager. When Mr. Isbell pressed him about the reason for this action, Mr. Travis stated, "We've heard you're using that marijuana again." At that point, Mr. Isbell purportedly asked to take another drug test. Then he "stormed out" and went home for the day. When he returned, Mr. Isbell was reassigned to work at the company headquarters and received a decrease in his pay. At that time, Mr. Isbell quit. The day that he left TEC he again smoked marijuana, "just like someone would have a drink."

---

[1]Hereinafter, Travis Electric Company will be referred to as "TEC" and Milton Travis will be referred to as "Mr. Travis."

2

On Mr. Isbell's first or second day of his new employment, his employer, Harlan Electric, required him to take a drug test. He informed that employer that he probably wouldn't pass the test, but took it. Rather than wait for the results, he told Harlan Electric that he was taking a leave of absence while his wife had surgery and then did not return. He decided to set up his own company.

Around the day Mr. Isbell quit TEC, a representative of First American Bank, Johnny Dudley, called Mr. Travis in an attempt to locate Mr. Isbell to check on a project he had been working on for the bank. During that conversation, Mr. Travis informed Mr. Dudley that Mr. Isbell no longer worked for TEC. According to Mr. Dudley, Mr. Travis said that "Tim had failed to take a drug test and that they had took his responsibility of driving a vehicle away from him, and he had gotten mad and left the company." Mr. Dudley also testified that Mr. Travis "said that it was a policy of Travis to give each employee a drug test and that Tim had some problems earlier in the year before that and he had – he had kind of talked to him about it and then they had asked him to take another test and he refused it." When asked if Mr. Travis said that Mr. Isbell was asked to take a drug test in February of 1996, Mr. Dudley answered in the affirmative and stated that he was told that Mr. Isbell "had took a drug test and not passed it earlier." He later agreed that Mr. Travis

> didn't tell . . . [him] basically anything other than, at one time, he'd [Mr. Isbell] flunked a drug test and that there was some suspicion that there might have been some further use and [TEC] took him off the truck and he quit.

In early December, Mr. Isbell formed Isbell Contracting Electric and started performing specific jobs for First American Bank. Just before Christmas, Mr. Travis visited a representative of First American Bank, Paul Carothers, to deliver a complimentary calendar. According to Mr. Carothers, Mr. Travis mentioned "that Tim had been taken off the road, brought back into the shop because of failing a drug test at the time he was still working for Travis." Mr. Carothers also recalled that:

> Milton [Travis] brought up the subject of Timothy Isbell doing some work for First American. . . He mentioned that Tim had failed a drug test while at Travis Electric. As a result, Tim ha[d] been reassigned to the shop. My recollection of the story was that other employees traveling with him on out-of-town jobs complained of Tim using drugs in the company truck and while they were present in the motels at night. This was the cause for the drug test.

Mr. Carothers could not recall whether Mr. Travis informed him that Mr. Isbell had subsequently passed a drug test. He had heard that, but could not remember the source. Mr. Carothers stated that he had learned that Mr. Isbell had failed a drug test before talking to Mr. Travis and had previously known that Mr. Isbell had left TEC because of some drug problems that had surfaced. He stated that Mr. Isbell's marijuana use was "kind of already known." About a month after his discussion with Mr. Travis, Mr. Carothers sent an e-mail to his supervisor, Mr. Meacham, asking advice on whether to permit Mr. Isbell to do any work for them. The e-mail stated, in part:

3

Recently Tim Isbell surfaced as a contractor for cabling. Ameristar [a First American subsidiary or affiliate] has requested to use him as they have been very satisfied with his work. I talked to him and got a proposal for some standard pricing which is cheaper than Travis . . .

Enter Milton Travis. Milton came by to pay a courtesy call and brought Tim up in the conversation. He repeated an allegation (which Johnny Dudley had already told me about) that Tim had tested positive for drugs while with Travis. He wasn't fired, but was reassigned, which caused him to quit. I asked him whether he had documented proof which he could share with me. Of course he doesn't; privacy issues.

So, I'm in a quandry whether I should permit Tim to do any work for us or not. We have a much delayed initiative to do regional RFPs for cabling work, but in the meantime what should I do? And could Tim's company be considered for the RFP?

Mr. Meacham testified, "Paul had communicated to me that we had a subcontractor doing work and that he had received some information regarding some type of substance abuse issue. I don't recall what the -- in my mind, it stuck as a substance abuse issue. . ." He shared the issue with other managers, one of whom responded with other concerns. She told Mr. Meacham, "I have a larger issue. How is an electrical subcontractor doing work at First American Bank and I don't know about it?" She was in charge of managing the facility, and stated that she normally had knowledge of subcontractors and that the bank needed to fine-tune the policy. She stated her concerns in another e-mail about Mr. Isbell or any other contractor working for the bank without certain procedures being followed:

In response to the Tim Isabell [sic] question: we cannot have anyone work in the First American Center without obtaining landlord approval. Also, I am not comfortable having an uncertain number of contractors working on our systems. When something goes wrong, it will be no one's fault. Choosing contractors to work on/in building systems needs to stay centralized through Facilities . . .

If we are dissatisfied with Travis' rates . . . then we need to put an RFP together and qualify another company to work for us. The parameters of qualification would include experience, references, insurance, and company depth since we often need them in more than one place at once.

One additional consideration is that we are on a program of strategic alliance with our good banking customers. That means they get preference. . . over any other RFP respondent.

Let me know if your guys want to go through the RFP and qualification process with

4

us, to try to qualify someone other than Travis to do their work. In any event, we should not have a process that allows non-Facilities employees to hire electrical or mechanical contractors to work in our owned or leased space.

As a result of this e-mail and his conversations with the facilities manager, Mr. Meacham issued an e-mail directive to Mr. Carothers, who forwarded it to others, stating:

Please don't extend any offers of contract work to Tim Isbell until you hear back from me. Is anyone else (AmeriStar?) contemplating using Tim? If so, please inform them that Tim is not yet approved to perform electrical work for us. FYI, it is not certain that Tim would be a "FANB-approved" electrician. I'll keep you posted.

Mr. Meacham testified that the reason for his e-mail was the facilities manager's concerns and the issues she raised in her e-mail. He agreed that the bank needed to make sure that any contractor used was on the bank's approved contractor list. He also testified that this action did not "close the door" on Mr. Isbell or anyone else doing work for the bank in the future if proper procedures were followed.

After Dave Dozier, an employee of Ameristar, First American Bank's investment services group, received this communication, he told Mr. Isbell that it appeared that Mr. Travis was trying "cut the legs out from under" him. Mr. Isbell received no new work at the bank after the e-mail from Mr. Meacham.

## II. Slander

At the close of Mr. Isbell's case, the trial court found that the only two claims actually asserted in this case were slander and tortious interference with contract. It granted TEC and Mr. Travis's motions for directed verdict on both.

Because the trial court directed verdicts for TEC and Mr. Travis, this case primarily involves questions of law rather than fact. *See Norman v. Southern Ry.*, 119 Tenn. 401, 422, 104 S.W. 1088, 1093-94 (1907). Thus, we must review the record to determine whether Mr. Isbell's evidence was sufficient to create an issue for the jury to decide. *See Underwood v. Waterslides of Mid-America, Inc.*, 823 S.W.2d 171, 176 (Tenn. Ct. App. 1991). In conducting this review, we may not weigh the evidence or evaluate the credibility of the witnesses. *See Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995); *Benson v. Tennessee Valley Elec. Coop.*, 868 S.W.2d 630, 638-39 (Tenn. Ct. App. 1993). Instead, viewing the evidence in the light most favorable to the nonmovant, we must give that party the benefit of all reasonable inferences from the evidence, and disregard all evidence contrary to that party's position. *See Eaton v. McLain,* 891 S.W.2d 587, 590 (Tenn. 1994); *Gann v. International Harvester Co.*, 712 S.W.2d 100, 105 (Tenn. 1986).

Directed verdicts are appropriate only when reasonable minds can reach no other conclusion. *See Williams v. Brown*, 860 S.W.2d 854, 857 (Tenn. 1993); *Crosslin v. Alsup*, 594 S.W.2d 379, 380

(Tenn. 1980). The jury should decide cases where, even if the facts are undisputed, reasonable persons could draw conflicting conclusions from the facts. *See Gulf, M. & O.R.R. v. Underwood,* 182 Tenn. 467, 474, 187 S.W.2d 777, 779 (1945); *Pettus v. Hurst,* 882 S.W.2d 783, 788 (Tenn. Ct. App. 1993). Such conclusions, however, must be based on more than speculation, conjecture, and guesswork. *See Daniels v. White Consol. Indus., Inc.*, 692 S.W.2d 422, 425 (Tenn. Ct. App. 1985). Directed verdicts are appropriate when the plaintiff's evidence fails to establish a *prima facie* case. *See Eaton v. McLain*, 891 S.W.2d at 590-91 n.3.

We will first review the trial court's dismissal of the slander claim. Regarding the slander claim, the trial court stated:

> Secondly, the truth is a defense to slander. I think there's some exceptions, but this is not one of them, and everything that was said was true and he did refuse to take a test. One time he did fail a test subsequently and passed the test one time, but the upshot of it is – the overview was there was a problem with marijuana and the Court grants the verdict on the grounds of slander.

The trial court's statement that "truth is a defense" is a reference to one of the well-settled principles of the law of defamation. In this State, both slander and libel are considered to be forms of defamation. *See Quality Auto Parts Co., Inc. v. Bluff City Buick Co., Inc.*, 876 S.W.2d 818, 820 (Tenn. 1994). "The basis of an action for defamation, whether it be for slander or libel, is the defamation resulted in an injury to the person's character and reputation." *Id.* Libel involves written defamation and slander, at issue here, involves defamatory language that is spoken. *See id.*

To establish a *prima facie* case of defamation, the plaintiff must prove that (1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or (4) with negligence in failing to ascertain the truth of the statement. *See Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999) (relying on RESTATEMENT (SECOND) OF TORTS § 580 B (1977)). "Publication" is a term of art meaning the communication of defamatory matter to a third person. *See id.*

Truth is an absolute defense "when the defamatory meaning conveyed by the words is true." *Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412, 420 (Tenn. 1978).

> The damaging words must be factually false. If they are true, or essentially true, they are not actionable, even though the published statement contains other inaccuracies which are not damaging. Thus, the defense of truth applies so long as the "sting" (or injurious part) of the statement is true. ". . . it is not necessary to prove the literal truth of the accusation in every detail, and that it is sufficient to show that the imputation is substantially true, or, as it is often put, to justify the 'gist,' the 'sting,' or the 'substantial truth' of the defamation."

*Stones River Motors, Inc. v. Mid-South Publ'g Co.,* 651 S.W.2d 713, 719-20 (Tenn. Ct. App. 1983).

6

To be actionable, the statement at issue must "constitute a serious threat to the plaintiff's reputation." *Id.* at 719.

Mr. Isbell's first argument in defense of his defamation claim is that the trial court misapplied the substantial truth doctrine because the "gist" of Mr. Travis's statements, as well as some of the exact words, were false. He maintains that the gist of Mr. Travis's comments was that he had a continuing drug problem when, in truth, he failed one drug test but passed a second.

The record, viewed in the light most favorable to Mr. Isbell, shows that Mr. Travis erroneously told Johnny Dudley that "Tim had failed to take a drug test." The remainder of Mr. Travis's statements to Mr. Dudley, that Mr. Isbell had failed a drug test and that "there was some suspicion that there might have been some further use and [TEC] took him off the truck and he quit," were true. Mr. Travis told Mr. Carothers that Mr. Isbell had failed a drug test and that employees traveling with him on out-of-town jobs had complained of his drug use. These statements were true. Thus, the only untrue statement Mr. Travis made was that Mr. Isbell had refused to take a drug test. The truth was that he had taken a drug test and failed. Taking his testimony in the best light, he also offered to take another test when he was reassigned. The question presented, then, is whether the statement that Mr. Isbell failed to take a drug test, while not the literal truth, is sufficiently close to the truth "to show that the imputation is substantially true, or, as it is often put, to justify the 'gist,' the 'sting,' or the 'substantial truth' of the defamation. . . ." *Ali v. Moore*, 984 S.W.2d 224, 229 (Tenn. Ct. App. 1998).

Mr. Isbell's second argument addresses a separate but related principle, defamation by implication. Tennessee law recognized the doctrine of defamation by innuendo or implication in *Memphis Publ'g Co. v. Nichols*, 569 S.W.2d at 412. In *Nichols*, a newspaper was held liable for defamation for printing a story which truthfully stated that upon finding her husband at the plaintiff's home, the wife shot the plaintiff. The article failed to mention that other individuals, in addition to plaintiff's husband, were present when the shooting occurred and that the shooting occurred in the afternoon. These omissions, which were said to give rise to the implication that the plaintiff and the shooter's husband were having an affair when caught by the shooter, were the basis for reversing the trial court's decision to grant the newspaper's motion for summary judgment.

The *Nichols* court observed:

> The proper question is whether the *meaning* reasonably conveyed by the published words is defamatory, "whether the libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced." (citations omitted.) The publication of the complete facts could not conceivably have led the reader to conclude that [plaintiff] and [shooter's husband] had an adulterous relationship. The published statement, therefore, so distorted the truth as to make the entire article false and defamatory. It is no defense whatever that individual statements within the article were literally true. Truth is available as an absolute defense only when the defamatory meaning conveyed by the words is true.

7

*Id.*, 569 S.W.2d at 420. In essence, *Nichols* stands for the proposition that "statements literally true may be actionable if they imply facts that are not true." Robert D. Sack & Sandra S. Baron, LIBEL, SLANDER & RELATED PROBLEMS § 3.6 (2d ed. 1994). "The rationale behind this rule is that, when truthful statements carry a defamatory innuendo, the factual implication should also be true to justify the implication." *Fitzgerald v. Tucker*, 737 So.2d 706, 717 (La. 1999). "The proper question is whether the meaning reasonably conveyed by the published words is reasonably understood in a defamatory sense by the reader or listener." *Pate v. Service Merchandise Co.,* 959 S.W.2d 569, 574 (Tenn. Ct. App. 1996).

Mr. Isbell argues that Mr. Travis's statements, even if literally true, constituted defamation by implication because they left out the key fact that he had passed his second drug test, which, he argues, gave rise to the false implication that he had a continuing drug problem. To apply the principles of defamation by implication to the facts in this case, we must look to whether Mr. Travis implied false, defamatory innuendo about Mr. Isbell by truthfully stating that Mr. Isbell failed a drug test. *See* Fitzgerald, 737 So.2d at 717. The question before us, then, is whether the inclusion of the fact that Mr. Isbell passed a second drug test, after thirty days notice of the test, would "have a different effect on the mind" of the hearer, in terms of creating a defamatory implication, than the effect created by the true statements actually made.

The gist of Mr. Travis's statements were that Mr. Isbell used marijuana. Mr. Isbell's admissions at trial regarding his use of marijuana, his use while on TEC trips, and his likely failure to pass the drug test given by his subsequent employer establish his regular use of marijuana. Further, it appears that Mr. Isbell's drug use was widely known in light of his testimony about his coworkers' response to his first drug test and his admission that he assisted a coworker and an acquaintance at First American Bank in purchases of marijuana. Under these circumstances, we decline to find that Mr. Travis's false statement that Mr. Isbell refused to take a drug test constituted "a serious threat" to Mr. Isbell's reputation. *Stones River Motors, Inc.*, 651 S.W.2d at 719. Accordingly, the trial court's finding that the statement was not defamatory is not reversible error.

Similarly, in light of the facts, we cannot say that the implication arising from Mr. Travis's statements was false. Unlike the plaintiff in *Nichols* who was clearly innocent of an extramarital affair, Mr. Isbell acknowledged his known use of illegal drugs. The truth is that Mr. Isbell failed a drug test, passed a second test a month later after notice, and subsequently consumed additional illegal drugs. In light of this, the omission of the fact that Mr. Isbell passed the second drug test does not create a sufficiently false impression to be actionable. Because the allegedly defamatory meaning behind Mr. Travis's words was true, the defamation by implication argument must fail. *Nichols*, 569 S.W.2d at 420.

Both of Mr. Isbell's arguments fail on their basic premise that the true facts which were published damaged his reputation in a way that would not have occurred if Mr. Travis (1) had not stated that Mr. Isbell failed to take a drug test or (2) had stated that Mr. Isbell passed a second drug test. Based upon his own testimony, Mr. Isbell established that he had often used marijuana and that a number of people knew about it. Mr. Isbell clearly expressed his opinion that there was nothing

wrong with using marijuana, an illegal drug, or in helping others buy it. He thus indicated his belief that statements that he used the drug, or statements that he failed a drug test, did not damage his reputation. To the extent that others did not share that opinion and the information that he used drugs created an impression damaging to his reputation, we see no basis for his argument that the fact that he could pass a drug test given sufficient notice would have prevented that damage. We affirm the trial court's dismissal of the slander claim.

### III. Interference With Contract

Mr. Isbell argues that the trial court erred in directing a verdict on his tortious interference with contract claim. He maintains that he had an implied-in-fact contract with First American to perform electrical work and Mr. Travis's conduct caused that contract to be breached in violation of Tenn. Code Ann. § 47-50-109.[2]

A contract may be expressed or implied, written or oral, but to be enforceable it must result from a meeting of the minds in mutual assent to terms, be based on sufficient consideration, and be sufficiently definite to be enforced. *See Johnson v. Central Nat'l Ins. Co.*, 210 Tenn. 24, 34-35, 356 S.W.2d 277, 281 (1962); *Jamestowne on Signal, Inc. v. First Federal Sav. & Loan Ass'n.*, 807 S.W.2d 559, 564 (Tenn. Ct. App. 1990). The contemplated mutual assent and meeting of the minds cannot be accomplished by the unilateral action of one party, nor by an ambiguous course of dealing between the two parties from which differing inferences regarding continuation or modification of the original contract might reasonably be drawn. *See Batson v. Pleasant View Util. Dist.*, 592 S.W.2d 578, 582 (Tenn. Ct. App. 1979); *Balderacchi v. Ruth*, 36 Tenn. App. 421, 424-25, 256 S.W.2d 390, 391 (Tenn. Ct. App. 1953). "[A] mere expression of intent or a general willingness to do something . . . in return for something to be received does not amount to an 'offer.'" *Talley v. Curtis*, 23 Tenn. App. 181, 186, 129 S.W.2d 1099, 1102 (1939).

> Generally, an implied contract is one which is inferred from the conduct of the parties; it is not necessarily expressed in words. *Judd v. Heitman,* 402 F.Supp. 929 (M.D. Tenn.1975). A promise will not arise by implication, however, when the circumstances and facts from which the promise would be drawn are contrary or completely inconsistent with the contract to be implied. 17 AM.JUR.2D *Contracts* § 3 (1964). Nor may a contract be implied in fact in the face of a declaration to the contrary by the party to be charged. *Travelers Ins. Co. v. Williams*, 541 S.W.2d 587 (Tenn.1976).

---

[2]Tenn Code Ann. § 47-50-109, which provides damages for procurement of a breach of contract, states:

It is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract. The party injured by such breach may bring suit for the breach and for such damages.

9

*V.L. Nicholson Co. v. Transcon Inv. & Fin. Ltd., Inc.*, 595 S.W.2d 474, 482 (Tenn. 1980).

It is undisputed that no written contract existed between Mr. Isbell and First American Bank. However, Mr. Isbell argues that a contract for future work arose because First American Bank established a course of dealing by faxing him work orders and he was told he could do some work for Ameristar in Memphis at some unspecified time in the future.

In contrast, Mr. Dozier, Mr. Isbell's primary, if not sole, contact with Ameristar testified that he had not contracted with Mr. Isbell for any future work but had allowed him to finish the jobs in process before cutting ties with him. Mr. Dozier denied breaching any contracts with Mr. Isbell. In addition, Mr. Carothers testified that he had no on-going relationship with Mr. Isbell and had promised him the possibility of future work "only to the extent of one job at a time." The e-mails set out above also establish that there was no contract with Mr. Isbell to do any work in the future, much less any specific amount of work. Each of the work orders sent to Mr. Isbell constituted separate contracts for specific jobs, each of which was completed.

Mr. Isbell asserts that he had a contract to do future unspecified work for First American. Viewed in the light most favorable to Mr. Isbell, this evidence simply is not sufficient to give rise to a jury question on whether a contract existed. Reasonable minds could not differ on the question of whether there was evidence of the requisite mutual assent and meeting of the minds. It is not present. Mr. Isbell's unilateral expectation that First American Bank would utilize his services in the future is insufficient to establish this element, which is essential to his claim of tortious interference with contract. *See Campbell v. Matlock*, 749 S.W.2d 748, 751 (Tenn. Ct. App. 1987) (the existence of a contract is an essential element in such claims).

The court held that the tortious interference with contract claim failed due to the lack of evidence of an express or implied contract between First American and Mr. Isbell. We affirm the trial court.

### IV. New Trial and Amendment of Complaint

Mr. Isbell frames his final issue as follows: "The trial judge erred in refusing to allow plaintiff a new trial on the grounds that defendants violated Tennessee law in releasing confidential drug test information." He argues that he proved that TEC and Mr. Travis violated Tennessee law by committing the tort of invasion of privacy and that he is entitled to a new trial on this cause of action, even though he did not allege that cause until well after the directed verdict against him.

Mr. Isbell did, indeed, file a motion for new trial which was denied by the trial court. That motion, however, was not based on his alleged entitlement to a new trial on a new cause of action, invasion of privacy. Mr. Isbell's motion contained essentially the same arguments as are presented in this appeal, addressing only the slander and inducement to breach causes of action. At the same time he filed his motion for new trial, Mr. Isbell also filed a motion to amend his complaint seeking

to add a cause of action based on invasion of privacy, and that motion was also denied.[3]

We first review the propriety of the trial court's denial of Mr. Isbell's motion for new trial. Trial courts are given wide latitude in deciding motions for new trial. *See Loeffler v. Kjellgren*, 884 S.W.2d 463, 468 (Tenn. Ct. App. 1994). Their decisions to grant or deny such motions are reviewed for an abuse of discretion. *See Esstman v. Boyd,* 605 S.W.2d 237, 240 (Tenn. Ct. App. 1979). In his motion for new trial, Mr. Isbell made essentially the same arguments he has asserted on appeal and argued that the trial court erred by granting a directed verdict. Having ourselves determined the issues adversely to Mr. Isbell, we cannot say that the trial court abused its discretion in refusing to grant a new trial on the basis of the same arguments, which were the only grounds asserted in the motion.

In his brief, Mr. Isbell states his request for relief as, "In the event this appellate court recognizes the trial judge's error on the defamation claim, the plaintiff should be able to sue under both the defamation and invasion of privacy claims." Based on that statement, our affirmance of the trial court's decision dismissing the defamation and inducement to breach claims would appear to dispose of Mr. Isbell's issues regarding denial of his motion to amend.

However, Mr. Isbell also attempts to combine in this appeal the arguments he made in the two separate motions to the trial court, taking the position that the trial court should have granted him a new trial for the purpose of allowing him to amend his complaint to allege a new cause of action. His argument is that he proved facts to support a finding that TEC and Travis committed the tort of invasion of privacy and that he should be allowed a new trial on an amended complaint alleging this cause of action for the first time. Although this ground is not set out in the motion for new trial, we will consider the simultaneous filing of both motions as raising the issue. *See Quartana v. Utterback*, 789 F.2d 1297, 1300 (8th Cir.1986) (a post-judgment Rule 15(a) motion for leave to amend the complaint should be considered a Rule 59(e) motion to alter or amend judgment because a "motion that draws into question the correctness of the judgment is functionally a motion under Civil Rule 59(e), whatever its label.") (quoting 9 MOORE'S FEDERAL PRACTICE, ¶ 204.12[1] (2d ed. 1985)); *see also* 6 Wright, Miller & Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1489, p. 695 (1990) ("As a practical matter, the motions . . . will be made simultaneously and decided together, since it usually would be a needless formality for the court to grant the motion to reopen the judgment only to deny the motion for leave to amend.").

### A. Which Rule Governs Consideration of Combined Motions

We have already determined that the trial court properly denied the motion for new trial on

---

[3]This motion was apparently prompted by a statement from the trial court when it dismissed the case. In reference to Mr. Travis's disclosure of the results of confidential drug test results, the court stated, "I don't feel comfortable dismissing this lawsuit. This is still within the statute of limitations. It's not libel. It's invasion of privacy and you may take that approach in another lawsuit."

the causes of action actually plead and dismissed after trial. The question before us now is whether the trial court acted within its discretion in denying Mr. Isbell a new trial for the purpose of allowing him to amend his complaint to add a new cause of action on the basis that justice requires the amendment.

We are unaware of any ruling by Tennessee courts specifically addressing the issue of the proper standard to be employed by a trial court in considering a motion to set aside a judgment of dismissal, after trial on the merits, combined with a post-dismissal motion to amend a complaint. One federal appellate court defined a similar issue as "whether a Rule 59(e) motion [to alter or amend the judgment] accompanied by a motion for leave to amend [the complaint] should be treated differently than any other Rule 59(e) motion," *i.e.*, whether traditional Rule 59(e) standards should be applied or whether standards governing a Rule 15(a) motion to amend the complaint should apply. *See Figgie Int'l, Inc. v. Miller*, 966 F.2d 1178, 1179-80 (7th Cir. 1992). The *Figgie* case involved a trial court's grant of summary judgment to defendants in ruling on a motion to dismiss, and there appears to be some debate regarding the standard to be applied in that situation.[4] However, we find little room to dispute the answer in the situation of a judgment of dismissal after trial.

Once a judgment is entered on the merits dismissing an action, the trial court would have to set aside or vacate that judgment before taking further action in the case. Without an order vacating the judgment dismissing the case on its merits, there technically exists no complaint to amend.[5]

---

[4]The federal courts have not uniformly resolved the issue of what standard to apply in considering similar motions made after the grant of a motion to dismiss prior to trial. *See Figgie Int'l, Inc.*, 966 F.2d at 1179-80 (discussing the various standards and finding it unnecessary to resolve the issue in that case).

Rule 59(e) states that motions to reconsider should only be granted if there is a showing of a manifest error of law or fact or if new evidence not previously discoverable is presented in support of the motion. *Russel v. Delco Remy Div. of General Motors Corp.*, 51 F.3d 746, 749 (7th Cir.1995). However, some courts have held that, when a motion for leave to amend a complaint is presented in conjunction with a Rule 59(e) motion, the more liberal standards of Rule 15(a) should govern. *See Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594 (5th Cir.1981); *Adams v. Gould*, 739 F.2d 858, 864 (3d Cir.1984), *cert. denied*, 469 U.S. 1122, 105 S.Ct. 806, 83 L.Ed.2d 799 (1985). These courts interpret the Supreme Court's opinion in *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), to allow amendment of a complaint where justice so requires, even if this amendment is technically sought post-judgment by way of a Rule 59(e) motion. *Dussouy*, 660 F.2d at 597; *Adams*, 739 F.2d at 864.

*Chavez v. Farmington Foods, Inc.*, No. 97-C-1910, 1997 WL 631173 at *3 (N.D. Ill. Oct. 1, 1997).

Tennessee appears to have adopted the more liberal standard where the complaint is dismissed on a Tenn. R. Civ. P. 12 motion, at least where no amendment has taken place prior to dismissal. *See Richland Country Club, Inc. v. CRC Equities, Inc.*, 832 S.W.2d 554, 559 (Tenn. Ct. App. 1991) (where court grants motion to dismiss for failure to state a claim, only extraordinary circumstances would prohibit plaintiff from exercising the right to amend its complaint).

[5]Federal courts have generally interpreted the Federal Rules of Civil Procedure as requiring that a judgment of dismissal be set aside before a complaint can be amended:

(continued...)

Therefore, logic and good procedural practice would dictate that even a motion to vacate the judgment on the basis that such setting aside is necessary in order to allow amendment must be scrutinized under Rule 59 or Rule 60 standards. We find the following reasoning persuasive:

> Most courts faced with the problem have held that once a judgment is entered the filing of an amendment [to a complaint] cannot be allowed until the judgment is set aside or vacated under Rule 59 or Rule 60. . . . This approach appears sound. To hold otherwise would enable the liberal amendment policy of Rule 15(a) to be employed in a way that is contrary to the philosophy favoring finality of judgments and the expeditious termination of litigation. Furthermore, the draftsmen of the rules included Rules 59(e) and 60(b) specifically to provide a mechanism for those situations in which relief must be obtained after judgment and the broad amendment policy of Rule 15(a) should not be construed in a manner that would render those provisions meaningless.
>
> The fact that a party desiring to amend after judgment has been entered is obliged first to obtain relief from the judgment imposes some important restrictions on the ability to employ Rule 15(a). For example, a judgment generally will be set aside only to accommodate some new matter that could not have been asserted during the trial, which means that relief will not be available in many instances in which leave to amend would be granted in the prejudgment situation.

6 Wright, Miller & Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1489 at 692-94.

While the quoted treatise section obviously deals with federal procedural rules, we think the reasoning applies to our equivalent state rules and to Tennessee's interest in finality. Therefore, we hold that a post-trial judgment dismissing an action must be set aside on the grounds available under

---

[5](...continued)

Where . . . a complaint is dismissed without leave to amend, the plaintiff can appeal the judgment, or alternatively, seek leave to amend under Rule 15(a) after having the judgment reopened under either Rule 59 or 60. Unless post-judgment relief is granted, the district court lacks power to grant a motion to amend the complaint under Rule 15(a). *See Public Citizen v. Lagged Group, Inc.*, 858 F.2d 775, 781 (1st Cir.1988), *cert. denied*, 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989); see also 3 Moore supra ¶ 15.10 at 15-107 ("[After a judgment of dismissal plaintiff must move under Rules 59(e) or 60(b) to reopen the judgment."); 6 Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1489 at 692-93 (1990) ("[O]nce judgment is entered the filing of an amendment cannot be allowed until the judgment is set aside or vacated under Rule 59 or Rule 60.")"

*Acevedo-Villalobos v. Hernandez,* 22 F.3d 384, 389 (1st Cir. 1994); *see also Figgie Int'l, Inc.*, 966 F.2d at 1179 ("It is well settled that after a final judgment, a plaintiff may amend a complaint under Rule 15(a) only with leave of court after a motion under Rule 59(e) or Rule 60(b) has been made and the judgment has been set aside or vacated."); *Amendola v. Bayer*, 907 F.2d 760, 765 n. 4 (7th Cir.1990) ("In this circuit, after a judgment has been entered, a party must have the judgment reopened pursuant to Federal Rule of Civil Procedure 59(e) or 60(b) and then request leave to amend pursuant to Rule 15(a).").

Tenn. R. Civ. P. 59 or 60, whichever is applicable, before the complaint can be amended. Therefore, even when the ground asserted for relief from the judgment is that it is necessary in order to allow amendment, the trial court must apply Rule 59 or Rule 60 standards to that ground.

## B. Application of Post-Judgment Motion Standards

Again, we have already decided that the trial court acted within its discretion in denying Mr. Isbell's motion for new trial on the grounds asserted in that written motion. We now consider, using the standard for post-judgment motions, whether the motion was also properly denied on the ground that Mr. Isbell should be entitled to a new trial on a new cause of action. Whether Mr. Isbell's post-trial motion should be considered a Rule 59 motion for new trial or a Rule 59.04 motion to alter or amend the judgment is not clear.[6] We think, in fact, that Mr. Isbell's motion, to the extent it requests vacating the judgment so that he can amend his complaint and start over, should more properly be considered a Tenn. R. Civ. P. 60 motion for relief from judgment. However, any distinction between these types of motions is not dispositive of the issue before us, because none appears to authorize the relief requested here.

In addition to the grounds for new trial which apply solely to jury verdicts and, therefore, are not applicable here, the most common ground is newly discovered evidence. *See* 4 MacLean, Bonnyman & Brandt, TENNESSEE PRACTICE § 59:7 and 59:8 (2000). Similarly, a motion to alter or amend the judgment, often used "to seek reconsideration of a dispositive ruling made on motion or after a non-jury trial," may also be based on mistakes of law by the trial court or newly discovered evidence. *See id* at § 59:9. To be successful in a motion on the basis of newly discovered evidence, the movant must prove that the evidence was discovered after the trial, that it could not have been discovered earlier with due diligence, that it is material and not just cumulative or impeaching, and that it will probably change the outcome if a new trial is granted. *See Spence v. Allstate*, 883 S.W.2d 586, 596 (Tenn. 1994). Mr. Isbell attempts to raise a new issue, not to introduce newly discovered evidence. The cause of action he seeks to add was available to Mr. Isbell throughout his lawsuit.

Rule 59 does not provide the relief sought by Mr. Isbell. "It is fundamental to our law 'that a party cannot raise a new issue, or present a new line of proof, on motion for a new trial that was not within the scope of the pleadings and was not presented to the court at the trial of the case.'" *Lones v. Blount County Beer Bd.*, 538 S.W.2d 386, 390 (Tenn. 1976) (quoting *Serv-U-Mart, Inc. v.*

---

[6]At least one judge has distinguished between those two types of motions. *See Grissim v. Grissim,* 637 S.W.2d 873, 875 (Tenn. Ct. App. 1982) (Conner, J., dissenting). Judge Conner has commented that "T.R.C.P. 59 clearly differentiates between a 'Motion for New Trial' and a 'Motion to Alter or Amend Judgment.' Obviously, the purpose of the former is to, in effect, start the trial proceeding anew, while the purpose of the latter is to modify in some respect actions previously taken by the court without returning to 'square one.'" *Id.* It is clear that the only way Mr. Isbell can get the relief he seeks on a claim of invasion of privacy is if a new trial is granted; however, his request for new trial is based on a ruling by the judge taking the case away from the jury. Some authority exists which would indicate that a directed verdict is not the proper subject for a motion for new trial. *See* 66 C.J.S., *New Trial* § 5b., p. 66; *see also* 4 MacLean, Bonnyman & Brandt, TENNESSEE PRACTICE §§ 59:6 - 59:9; *but see Moore v. Standard Life & Accident Ins. Co.*, 504 S.W.2d 373, 375 (Tenn. Ct. App. 1972).

*Sullivan County*, 527 S.W.2d 121, 124 (Tenn. 1975)). "We do not find any authority which authorizes a motion to alter or amend in order to allow a party to present her case under a new theory when the facts and law were available to be argued at trial prior to the court's original decree." *Spencer v. Hurd Inv. Properties Inc.*, Shelby Law No. 67, 1991 WL 60541 (Tenn. Ct. App. April 23, 1991) (perm. app. denied Sept. 9, 1991).

Tenn. R. Civ. P. 60 provides a mechanism whereby, on terms that are just, a trial court may relieve a party from a final judgment for reasons specified in the rule: (1) mistake, inadvertence, surprise, or excusable neglect; (2) fraud, misconduct, or other misconduct of an adverse party; (3) the judgment is void; (4) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that a judgment should have prospective application; or (5) any other reason justifying relief from the operation of the judgment. Tenn. R. Civ. P. 60.02. Giving Mr. Isbell's request the most favorable interpretation, we will consider his combined motions as a motion for relief from the judgment of dismissal under subsection (5), "for any other reason justifying relief." The reason he gives is that justice requires a new trial on the cause of action he did not allege but thinks he proved.

Rule 60.02(5)'s "any other reason," however, is construed as an exacting standard:

> It has been said that despite its broad language, Tennessee Rule of Civil Procedure 60.02(5) is construed narrowly. The standards of Rule 60.02(5) "are more demanding than those applicable to the other grounds for [Rule] 60.02 relief." Tennessee rule of Civil Procedure 60.02(5) is intended to provide relief only in the most unique, exceptional, or extraordinary circumstances. Rule 60.02(5) is applicable only to situations that are not covered by the other clauses in Rule 60.02 or in cases of extreme hardship. Tennessee Rule of Civil Procedure 60.02(5) is "not for the purpose of relieving a party from free, calculated, and deliberate choices he has made."

*NCNB Nat'l Bank of North Carolina v. Thrailkill*, 856 S.W.2d 150, 154 (Tenn. Ct. App. 1993) (citations omitted).

Mr. Isbell's desire to have another opportunity for redress under a theory of law which existed at the time of his original complaint does not rise to the level of "extraordinary circumstances" justifying relief under Rule 60. *See Underwood v. Zurich Ins. Co.*, 854 S.W.2d 94, 98 (Tenn. 1993); *Davidson v. Davidson*, 916 S.W.2d 918, 923 (Tenn. Ct. App. 1995).

Federal courts considering similar requests to be allowed to present new issues, arguments, or causes of action after judgment have found that Fed. R. Civ. P. 59 and 60 do not authorize that relief. It is well-settled under federal law that Fed. R. Civ. P. 59 may not be used to bring a claim that should and could have been raised earlier. *See Figgie Int'l, Inc.*, 966 F.2d at 1180. As one court has observed:

15

Rule 59(e) permits the parties to file, within ten days of the entry of a judgment, a motion to alter or amend the judgment. It may be invoked to alert the court to matters such as newly discovered evidence or manifest errors of law or fact. However, the Rule does not give a party the opportunity to undo its own procedural failures or present new evidence or arguments "that could and should have been presented to the district court prior to judgment."

*Chavez v. Farmington Foods, Inc.*, 1997 WL 631173 at *1 (citations omitted).

Similarly, another court, considering a Fed. R. Civ. P. 60 motion to set aside its earlier grant of summary judgment dismissing plaintiff's lawsuit and to allow amendment of the complaint to add an additional issue, observed that Rule 60 standards required a showing of extraordinary circumstances and that "the desire to pursue other legal theories that were always available and squarely implicated in the defendant's position herein does not present any extraordinary circumstances, and in fact would turn the presumption of finality of judgments on its head." *Rastelli Bros., Inc. v. Netherlands Ins. Co. T/A Peerless Ins. Co.*, 68 F. Supp. 2d 451, 454 (D. N. J. 1999). The court further explained:

Rather than an unusual circumstance such as a change in controlling law or newly discovered evidence, plaintiff simply argues that it should be allowed to file an Amended Complaint because this Court has adjudged that plaintiff may not obtain the relief sought in the initial Complaint. This argument is unavailing. In the Complaint, plaintiff chose its issues, the parties litigated them, and the Court decided them upon the merits in favor of the defendant. This case having been discovered, briefed, argued, and decided on the merits, plaintiff cannot now bring an entirely new lawsuit in the disguise of a motion to amend, especially when no circumstance prevented plaintiff from doing so prior to judgment.

*Id.*

We find the reasoning of these courts sound and applicable to Mr. Isbell's request. As stated in *Freeman v. Continental Gin Co.*, 381 F.2d 459, 469 (5th Cir. 1967), and quoted elsewhere many times, a busy court "need not allow itself to be imposed upon by the presentation of theories *seriatim*." Neither should the opposing party who has undergone the burdens of discovery, preparation, and trial of a matter be imposed upon by being forced to undergo a second trial because the plaintiff wants to add a cause of action he did not assert, but could have asserted, earlier. "[T]here must be an end finally to a particular litigation." *Rastelli Brothers, Inc.*, 68 F. Supp. 2d at 453.

Therefore, we hold that the trial court properly denied Mr. Isbell's motions because neither Rule 59 nor Rule 60 entitles him to the relief he sought.

## C. Rule 15 Amendment After Judgment on the Merits

Mr. Isbell asserts that his motion to amend should have been granted, first on the basis of Tenn. R. Civ. P. 15.01's direction that "leave [to amend] shall be freely given when justice so requires." Implicit in this assertion is an argument that the motion to amend can be considered even if the judgment were not vacated or that Rule 15 standards should be applied to his motion for new trial. We have already determined those issues. However, even if we applied Rule 15 to his motions, the outcome would not change.

Prior to the adoption of the Tennessee Rules of Civil Procedure, trial courts were vested with wide discretion in determining whether to allow amendment of pleadings. "The exercise of discretion by a trial judge in matters of amendment 'has been seldom adversely reviewed on appeals; and it will be presumed that allowing or refusing an amendment was done in the exercise of legal discretion, in the absence of a showing to the contrary.'" *Buck v. West*, 58 Tenn. App. 539, 542-43, 434 S.W.2d 616, 617 (Tenn. Ct. App. 1968); *see* Tenn. Code Ann. § 20-1504 [repealed]. That broad discretion, however, was described in language implying that it did not include the allowance of post-judgment amendment. "The matter of allowing amendments . . . is within the discretion of the court and these amendments may be allowed at any stage in the proceedings before a case is finally submitted to the jury or at any time before judgment." *Buck*, 58 Tenn. App. at 542, 434 S.W.2d at 617; *see also Daniels v. Talent*, 212 Tenn. 447, 462, 370 S.W.2d 515, 522 (1963).

In decisions after the adoption of Rule 15, our courts have interpreted the rule's "freely given" language as a limitation on the trial court's discretion to deny amendment. "This proviso in the rules substantially lessens the exercise of pre-trial discretion on the part of a trial judge." *Branch v. Warren*, 527 S.W.2d 89, 91-92 (Tenn. 1975); *see HMF Trust v. Bankers Trust Co.,* 827 S.W.2d 296, 301 (Tenn. Ct. App. 1991).[7] As the quote from *Branch v. Warren* demonstrates, however, language in those cases holding that Rule 15.01 substantially lessens the trial court's discretion specifically limits that holding to the exercise of pre-trial discretion. *See Huntington Nat'l Bank v. Hooker*, 840 S.W.2d 916, 923 (Tenn. Ct. App.1991)(citing *Branch v. Warren*, 527 S.W.2d 89 at 91-92); *Gardiner v. Word,* 731 S.W.2d 889, 891 (Tenn. 1987) ("Cases since *Branch v. Warren* have emphasized the liberality with which trial courts should approach the question of whether a pretrial motion to amend should be granted.").

Federal courts have similarly, but more explicitly, interpreted Rule 15(a) of the Federal Rules of Civil Procedure in the post-judgment situation:

> While Fed. R. Civ. P. 15(a) endows a district court with "virtually unlimited discretion" to allow amendments before entry of judgment, that discretion narrows considerably after entry of judgment. *See* 6 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 1489 (2d ed. 1990 &

---

[7]The federal rules have been similarly interpreted. *See Dussouy v. Gulf Coast Inv.Corp.,* 660 F.2d at 597 ("[R]ule 15(a) severely restricts the judge's freedom, directing that leave to amend 'shall be freely given when justice so requires.' It evinces a bias in favor of granting leave to amend.").

Supp.1999).

*Vielma v. Eureka Co.*, 218 F.3d 458, 468 (5th Cir. July 20, 2000); *accord Dierson v. Chicago Car Exch.*, 110 F.3d 481, 489 (7th Cir. 1996); *First Nat'l Bank of Louisville v. Continental Ill. Nat'l Bank & Trust of Chicago*, 933 F.2d 466, 468 (7th Cir. 1991) (the presumption in favor of liberality in granting motions to amend, Fed. R. Civ. P. 15(a), is reversed after judgment has been entered).

> While Rule 15(a) establishes that leave to amend should be "freely given," post-judgment motions to amend are treated with greater skepticism than pre-judgment motions. The likelihood that amendment will cause undue delay in the proceedings is a legitimate rationale for denying a motion to amend. After a judgment has been issued, the conclusion that amendment will cause undue delay is particularly justified.

*Premo v. Martin*, 119 F.3d 764, 772 (9th Cir. 1997), *cert. denied,* 522 U.S. 1147 (1998) (citations omitted).

> It is well established that the presumption that leave to amend shall be freely given pursuant to Rule 15(a) disappears after the entry of judgment. *Harris v. City of Auburn,* 27 F.3d 1284, 1287 (7th Cir.1994). A party seeking amendment at that stage of the proceedings must provide the district court with a good reason to grant its motion. *See id.*, (citing *First Nat'l Bank v. Continental Illinois Nat'l Bank,* 933 F.2d 466, 468 (7th Cir.1991)).

*Illinois Conference of Teamsters and Employers Welfare Fund v. Steve Gilbert Trucking*, 71 F.3d 1361, 1368 (7th Cir. 1995).

While federal decisions interpreting federal rules of procedure are not binding on state courts, we find them helpful in interpreting our own rules which are modeled after the federal. "It is proper that Tennessee courts look to the interpretation given comparable federal rules by the federal courts." *Williamson County v. Twin Lawn Dev. Co.*, 498 S.W.2d 317, 320 (Tenn. 1973); see *Huntington Nat'l Bank*, 840 S.W.2d at 921. Regarding the effect of Rule 15's directive that amendment be freely granted when justice so requires, we find the reasoning of the federal courts quoted above sound and not inconsistent with interpretations by Tennessee appellate courts. Therefore, we hold that motions to amend, made after judgment on the merits, pursuant to Tenn. R. Civ. P. 15.01, are not entitled to any presumption favoring amendment.[8]

Factors to be considered in deciding whether to allow amendments to pleadings include undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment. *See Harden v. Danek, Med. Inc.*, 985 S.W.2d 449, 454 (Tenn. Ct. App.

---

[8]We note that Rule 15.02 (motion to amend to conform pleadings to the evidence) specifically provides that the motion to amend may be made "at any time, even after judgment," but Rule 15.01 has no similar language.

1998). A number of federal courts, applying these or similar factors, have determined that post-judgment motions to amend to add new issues, particularly those made after dismissal on the merits, were properly denied.

> In cases where a party seeks to amend her complaint after entry of judgment, "we have consistently upheld the denial of leave to amend where the party seeking to amend has not clearly established that he could not reasonably have raised the new matter prior to the trial court's merits ruling." *Briddle* [*v. Scott*], 63 F.3d [364] at 380 [(5th Cir. 1995)]; *see also* Wright et al., § 1489 ("A number of courts, exercising their discretion under Rule 15(a), have refused to allow a post-judgment amendment when the moving party had an opportunity to assert the amendment during trial but waited until after judgment before requesting leave; these courts have based their conclusions on the moving party's undue delay.").

*Vielma*, 218 F.3d at 468.

> We have consistently recognized undue delay as justifying denial of leave to amend . . . particularly where leave to amend is sought to raise new matters after the trial court has ruled on the merits or entered judgment. In such circumstances we have consistently upheld denial of leave to amend where the party seeking to amend has not clearly established that he could not reasonably have raised the new matter prior to the trial court's merits ruling.

*Briddle v. Scott,* 63 F.3d 364, 379 (5th Cir. 1995).

We find this reasoning persuasive and, when applied to a judgment of dismissal on a directed verdict after plaintiff has put on his proof, compelling. In such situations, as here, it is less likely that justice will require amendment. *See Twohy v. First Nat'l Bank of Chicago*, 758 F.2d 1185, 1196 (7th Cir. 1985) (justice may require something less in post-judgment than in pre-judgment situations). We can find no basis upon which the trial court should have or could have granted Mr. Isbell a new trial so that he could have another "bite at the apple" under a new theory which was available to him throughout these proceedings. Therefore, we find that the trial court acted within its discretion to refuse to amend the complaint under Tenn. R. Civ. P. 15.01, so as to allege a new cause of action after a directed verdict on the causes of action initially alleged and tried.

Mr. Isbell also makes an argument that another section of Rule 15 requires that he be allowed to amend his complaint. That section, Tenn. R. Civ. P. 15.02, provides:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. Provided, however, amendment after verdict so as to increase

19

the amount sued for in the action shall not be permitted. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice that party in maintaining the action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

Under the language of Rule 15.02, the pleadings may be amended when issues not previously raised are tried by implied consent. The trial judge's determination with respect to the issue of implied consent must be upheld unless there has been an abuse of discretion. *See Zack Cheek Builders, Inc. v. McLeod,* 597 S.W.2d 888, 891 (Tenn. 1980); *Lapray v. Smith*, 804 S.W.2d 87, 91 (Tenn. Ct. App. 1990).

Rule 15.02 codifies the common sense notion that if the parties actually tried an issue "the content of the pleadings and a retrial to tread old ground become meaningless. . . Indeed, under a proper interpretation of Rule 15.02, . . . [amendment is] largely unnecessary, except as a housekeeping measure designed to insure the integrity and clarity of the record on appeal." *Zack Cheek Builders, Inc*., 597 S.W.2d at 892. Rule 15.02 clearly seeks to place substance over form, and the real question before us is whether the parties actually tried the issue delineated by the amendment. In short, the ultimate inquiry is whether there was implied consent from all parties in this case to try the issue of invasion of privacy. *See Wallace v. Hardin*, No. 02A01-9702-CH-00048, 1997 WL 775572 at *6 (Tenn. Ct. App. Dec. 17, 1997) (no Tenn. R. App. P. 11 application filed). Mr. Isbell's own admission that the issue was not tried appears to answer that question. In reference to the invasion of privacy claim, his motion to amend specifically stated "such issues were not tried in the previous trial . . ."

In fact, Mr. Isbell does not seek to amend the judgment simply to conform to the evidence. Instead, he seeks to alter the judgment by vacating the dismissal. He does not want to amend the complaint to conform to evidence adduced at trial, but wants a new trial on a new cause of action. Rule 15.02 is simply not available to him to provide the relief he wants. The trial court acted within its discretion in refusing to grant the motion to amend pursuant to Rule 15.02.

V.

Accordingly, the judgment of the trial court is affirmed. This case is remanded for any further proceedings which may be necessary. Costs of this appeal are to be taxed to Mr. Isbell, for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE

20